IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2018 Session

## ROBERT WAYNE GARNER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Giles County**
No. 15034      Stella L. Hargrove, Judge

_____

### No. M2017-00417-CCA-R3-PC

_____

The Petitioner, Robert Wayne Garner, appeals the denial of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel and that the post-conviction court abused its discretion by not allowing one of his witnesses to finish testifying at the evidentiary hearing. After review, we dismiss this appeal for lack of jurisdiction.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

John M. Schweri, Columbia, Tennessee, for the appellant, Robert Wayne Garner.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; J. Michael Taylor, District Attorney General; and Kyle E. Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The facts of the underlying case were recited by this court on direct appeal as follows:

On August 13, 2011, [the Petitioner], after a jury trial, was convicted of first degree murder in perpetration of a felony, aggravated arson, and theft of property over $10,000 and less than $60,000. The jury heard 44

witnesses and viewed 61 exhibits. The District Attorney General presented this circumstantial evidence case. The murder of Brenda Wilburn was a heinous crime. Ms. Wilburn was assaulted, bound, gagged, and her house burned down around her. After three days of testimony and seven hours of deliberation, the jury verdict was unanimous on all counts. [The Petitioner] was sentenced to life in prison plus 25 years.

. . . .

Trial proof indicates [the Petitioner] needed money. [The Petitioner] was behind in his rent; his electric bill was due; and his daughter's car needed expensive repairs. His wife had previously pawned her jewelry for needed cash. He earned only $125 in his last paycheck as a truck driver. [The Petitioner] found a way to get the money he needed. A former tenant of Brenda Wilburn, [the Petitioner] had visited her only a few days earlier and was familiar with her house. [The Petitioner] knew Ms. Wilburn kept money in her home, knew she wore expensive jewelry, and knew she lived alone.

The prosecutor's theory of the case was that [the Petitioner] entered her home on Highway 64 near Pulaski, Tennessee, around 10:00 a.m. on January 19, 2011, and assaulted Ms. Wilburn. He tightly tied her hands behind her back and bound her ankles with electrical wire. [The Petitioner] placed a plastic bag containing her blood-covered panties over her head. He followed with a second plastic bag, tied securely, effectively smothering Ms. Wilburn. A piece of clothing was found tied around her neck strangling her. Trial testimony revealed Ms. Wilburn probably suffered greatly during the last few minutes of her life.

[The Petitioner] set fire to the house and fled the premises. Later investigation revealed Ms. Wilburn was already dead when the flames consumed her body. The fire burned for about an hour before a passerby saw smoke and flames coming from the house and called 911.

Firefighters arrived and found a rapidly growing, very hot fire. A quick investigation found Ms. Wilburn's cars still on the premises. Three firemen attempted to enter the dwelling and effectuate a rescue. Firefighters were repelled by the excessive heat and were unable to proceed more than a few feet into the house. Tennessee Bureau of Investigation (TBI) and local police were called to the scene. It took several hours for

the fire to cool so debris could be cleared. The intense fire collapsed the two story house into a single mound of smoking embers.

Investigators, sifting the rubble, found the body of Ms. Wilburn located in what was once a walk-in closet. Her body was severely burned. She had first, second, third and fourth degree burns over 90% of her body. Her hands and feet were completely burned off. Clothing protected her head from complete destruction, and the plastic bags on her head were only partially burned. She was nude from the waist down.

The proof showed that while the fire was still burning, [the Petitioner] had unexplained money. The same day he paid his electrical bill, his rent and offered to make extra payments. That same afternoon he paid cash for the repairs to his daughter's car and payments on his furniture. [The Petitioner] gave his wife money to pay her probation fees and to go shopping at Walmart. Mrs. Garner paid probation fees of five times the amount she normally paid each week.

[The Petitioner]'s wife liked jewelry, and [the Petitioner] gave her a large two-carat solitaire ring and a diamond necklace. The solitaire ring had a unique flaw that made it positively identifiable as belonging to Ms. Wilburn. The ring appraised for $12,000, and the necklace for $750.

The proof showed Mrs. Garner told people [the Petitioner] had given her the new jewelry, including the two-carat diamond solitaire ring and the diamond necklace. [The Petitioner] gave her the jewelry immediately after the incident at Ms. Wilburn's house. [The Petitioner] also gave her money to redeem her previously pawned jewelry. When [the Petitioner]'s wife asked him where he got the money and jewelry he responded "you're better off if you don't know." The investigation revealed no credible alternative explanation for [the Petitioner]'s sudden possession of wealth.

The circumstantial proof continued. Mrs. Garner went to Walmart with a friend and while in the parking lot showed her friend cash totaling $4,800 in one-hundred dollar bills.

The total bills Mr. and Mrs. Garner paid and the money his wife displayed was roughly equal to the amount of money known to be in Ms. Wilburn's possession shortly before her death. Police, canvassing local pawn shops, found pawned jewelry items including a pendant necklace belonging to Mrs. Wilburn. The pawn ticket showed Mrs. Garner pawned the pendant a few days after the murder. Mrs. Garner was questioned by

the police, and she wore the unique solitaire ring to the police station for her interview.

A local citizen found a credit card with Ms. Wilburn's name on it lying near a mail box and notified police. Investigators searched along the road from near where [the Petitioner] lived ending at Ms. Wilburn's house. They found two other credit cards also belonging to Ms. Wilburn, a used condom, pair of shoes and some other items. The shoes were similar to a pair of shoes worn by [the Petitioner] previously during a police interview. All items gathered were subjected to tests, and only the credit cards were conclusively tied to the case.

[The Petitioner] attempted to establish an alibi. He failed. [The Petitioner] had served as a police informant for drug related purchases. He called his police contact the afternoon of the fire and asked what the police knew about the fire. [The Petitioner] also called Sheena Huntley, a former business associate, and indicated he had an alibi for the time of the fire, even though there was no reason Sheena Huntley should suspect he would need one.

When [the Petitioner] was arrested, he told police a story of meeting two men. According to [the Petitioner], these same two men had previously assaulted [him] at a motel. [The Petitioner] insists he met the two men at the same motel and purchased a bag of assorted jewelry from them for $100. [The Petitioner] stated a man (Mr. Gentry) living at the motel was present and could verify his purchase. Upon inquiry by police and in testimony during trial, Mr. Gentry, the man [the Petitioner] said would confirm his alibi, vehemently denied ever seeing [the Petitioner] at the motel and denied any transaction ever took place in his presence.

State v. Robert Wayne Garner, No. M2011-02581-CCA-R3-CD, 2013 WL 5461099, at *1-3 (Tenn. Crim. App. Sept. 30, 2013), perm. app. denied (Tenn. Feb. 12, 2014) (designated not for citation). This court affirmed the Petitioner's convictions on appeal, and the Tennessee Supreme Court denied his application for permission to appeal. According to the Petitioner, his application for permission to appeal to the United States Supreme Court was denied on November 3, 2014.

The Petitioner filed a pro se petition for post-conviction relief on July 2, 2015, and an amended petition was filed by appointed counsel on October 23, 2015. The post-conviction court conducted an evidentiary hearing, at which the Petitioner's trial counsel testified that he presented an alibi defense at trial. For that reason, he chose not to cross-examine some of the State's witnesses, such as first responders, because he did not see

any value in questioning or attacking the evidence at the crime scene. Counsel spoke with the lead investigator, Detective Mike Chapman, on a couple of occasions prior to trial. Detective Chapman conducted a lengthy, videotaped interview of the Petitioner, "which was riddled with difficulties for the defense." Counsel did not cross-examine Detective Chapman because Detective Chapman's accounting of the crime scene was not relevant in light of the Petitioner's alibi defense and Detective Chapman's interaction with the Petitioner was memorialized on the videotape. Counsel said that he explained to the Petitioner that he did not see any merit in cross-examining the crime scene witnesses given the defense of alibi.

Counsel testified that he had a lot of communication with the prosecutors leading up to trial. He believed that they provided him with a witness list, but his common practice was also to check with the clerk to see whom the State had served with subpoenas. As such, he had a good grasp on who was going to testify at trial. He did not speak to all the witnesses beforehand because some of them refused to talk to him or were "just reluctant" to discuss the case.

Asked to explain why he started his opening statement by saying to the jury, "I don't put too much stock in an opening statement[,]" counsel stated that the case was going to involve a "tremendous amount of proof" and "was going to be a lot of overload for the jury[,]" and he wanted to convey that it was going to have to hear the evidence. He added that, "I may have said something like I probably will have a lot more to say in closing once you have seen the evidence and we can ferret through it and see what points towards guilt or innocence."

Counsel testified that the Petitioner told him that he had bought the victim's jewelry from two African-American men at a motel. Counsel hired investigators, but the men "were just simply unfindable." He was given information that a man named Jerry Gentry might be able to corroborate that the purchase took place. Counsel could not recall if he personally spoke with Mr. Gentry, but his investigators found him, and he was subpoenaed for trial.

Counsel testified that the police investigator collected a number of items on a "walk" to the Petitioner's house from the crime scene, including a bloody glove, tennis shoes, the victim's credit cards, and a used condom. Counsel reviewed the TBI report that listed all the items in the case that were submitted for DNA testing. The Petitioner's DNA was not found on any of the items. Testing of a belt revealed a DNA profile that was a mixture of genetic material from two unknown individuals. Counsel admitted that he did not request that the TBI lab submit the profile to the larger CODIS offender database. However, he interviewed the TBI forensic scientist about his test results. It was counsel's view, from the defense perspective, that he did not want to run the profile

through the larger database because the presence of DNA from other persons was "pay dirt for an alibi defense[,]" as he wanted to show that the Petitioner "had nothing to do with this stuff that was at the crime scene."

Counsel further testified that the DNA profile on the bloody glove did not match the victim or the Petitioner. He chose not to have the results checked in the CODIS database because he felt that the fact that the DNA did not match the Petitioner "was perfect" and that he "couldn't have asked for anything better." He said that he was "quite frankly, surprised when they submitted it as evidence in the State's case in chief because of that disconnection with [the Petitioner]." Counsel also noted that he had "some suspicions" that the Petitioner's son was involved, and he did not want to risk further DNA testing revealing that it was the son's DNA as such could be detrimental to the defense. Counsel said that he "was very happy with the results of this bloody glove completely distancing [the Petitioner]."

Counsel recalled that the victim's sister testified at trial that she and the victim had sent six text messages back and forth the morning of the incident, but he did not question her about the content of the messages because he did not believe the content to be relevant. However, he thought the messages were "somewhat helpful" in establishing a timeline. He could not recall whether he had seen the messages or was just told about them, but he remembered being familiar with their contents. He believed that he interviewed the victim's sister either by phone or in person.

Counsel testified that he prepared a motion in limine to exclude evidence that did not have any fingerprints or DNA connecting it to the Petitioner. However, as a matter of strategy, he decided to withdraw the motion because "if the State was going to introduce evidence that had no relation to my client being at the scene of the crime, that would be helpful to me, because we had an alibi defense." Counsel was sure that he had spoken to the Petitioner about this strategy on many occasions.

Counsel recalled that he obtained funding for investigative services in $5,000 increments as required by court rules, receiving a total of $15,000 to $20,000. He worked with two investigators and sent them out "many times" to collect evidence and interview witnesses. The investigators also conducted a phone poll to gather information for counsel's motion for change of venue, as counsel had determined from researching and talking to other attorneys that a poll of potential jurors was the "accepted and approved way to find out how the jury pool felt about publicity of a case."

Counsel testified that his records reflected that he met with the Petitioner at least twenty-three times, either in the jail or a courtroom setting. He recalled that they "spent quite a bit of time together[,]" during which they reviewed the physical evidence, TBI

reports, the Petitioner's five-hour video-recorded interview with the police and the Petitioner's jailhouse phone calls. Part of counsel's preparation for trial included reviewing the recordings of the Petitioner's 252 jailhouse phone calls that the State had provided in discovery. Each of the calls was about ten minutes long. Counsel personally listened to about forty of the calls, and his office staff listened to the remaining calls and "flagged" anything relevant to the case.

Counsel testified that he discussed all of the anticipated evidence with the Petitioner and "how [they] were going to deal with every piece of evidence." Counsel recalled that he and the prosecutors were surprised at trial when the medical examiner produced a photograph of the victim's watch. However, the watch turned out to be helpful to the alibi defense because it showed that the watch had stopped at 10:20 a.m., which was consistent with the timeline counsel wanted to establish.

Counsel testified that there had been an agreed order to redact the video of the Petitioner's interview with the police to remove any references to voice stress analysis. Counsel and the prosecutors listened to the redacted copy together, but when it was played at trial there was one reference to the voice stress analysis test that they had all overlooked. Counsel chose not to object to the reference because it was "very benign," and he thought that "drawing attention to it was not a good idea." On cross-examination, counsel elaborated that the reference was fleeting and hard to hear, and an objection with a curative instruction would have just called attention to it.

Counsel recalled that the Petitioner's son was found in the possession of some jewelry that was consistent with some of the items stolen from the victim. Counsel said that he talked to the Petitioner at length about two areas of concern: the Petitioner's possession of the jewelry and his having a large amount of cash for which there was "no good explanation[.]" The Petitioner told him that the money came from selling stolen copper and drug sales by the Petitioner's son. Counsel remembered checking with some scrap metal dealers but was unable to substantiate the sales.

Counsel stated that he investigated the victim's boyfriend, Charles Smith, "as a possibility as another person who may have had a motive to have done this." However, Mr. Smith was "very reluctant to talk" and if counsel did speak with him, "it was limited." It was likely that Mr. Smith decided not to talk to him once counsel or one of counsel's investigators "start[ed] asking questions about the situation[.]"

Counsel did not recall the Petitioner's requesting that he obtain the help of an expert in arson investigation, and counsel did not think that such an expert would have been valuable in light of the Petitioner's claim that he did not start the fire. Counsel knew that the State was going to present a TBI arson investigator as an expert witness,

and counsel spoke to the agent and reviewed his report "probing it for defense strategies or defense value."

Counsel testified that he called three to five witnesses to testify at trial, including the Petitioner's step-daughter, to help establish the Petitioner's timeline the morning of the murder in support of his alibi defense. In addition, counsel treated some of the State's witnesses as his own, such as the workers at the car repair shop where the Petitioner had dropped off his car the morning of the offense. However, none of the witnesses could specifically place the Petitioner somewhere else at the time the fire was estimated to have started.

Dave Smith testified that he was a certified fire investigator with a private company that does work for a variety of clients, including insurance companies and state agencies. He estimated that he had been involved in the investigation of more than 1,500 fires in his career. Mr. Smith said that he reviewed the origin and cause statement prepared by TBI Bomb and Arson Agent Adam Barnes, as well as trial transcripts and various other law enforcement and investigative reports related to the incident. Mr. Smith then testified about the national standards for fire investigation and the seven-step process that should be taken in an investigation.

Mr. Smith testified that he was critical of Agent Barnes' report, particularly because he felt that it was "incredibly short . . . for an incident of this nature." He noted that the report omitted details about how the scene was processed and did not "explain any of the excavation of the reconstruction done of the scene[.]" Mr. Smith also noted that Agent Barnes did not describe how he came to his conclusion about the origin and cause of the fire. Mr. Smith elaborated: "I will say incontestably that . . . it was, in fact, an arson; however, [Agent Barnes] took an investigative leap by . . . concluding . . . that the fire originated where the body was[,]" and he "didn't take any of the steps that are required . . . to get to that conclusion."

At this point, the prosecutor lodged an objection to "this entire line of testimony" based on relevance. The prosecutor elaborated: "[N]ow that I have heard Mr. Smith testify . . . that he agrees . . . that the cause of the fire was unquestionably arson. . . . [T]hen for post[-]conviction purposes, I don't see the relevance as to anything that [Agent] Barnes did or didn't do." Defense counsel responded that further questioning would show how "improper handling of the fire could have contributed to evidence being mishandled that could have been tested for DNA[.]" Defense counsel further argued that had counsel secured the services of an expert, he could have uncovered evidence that could have been helpful to the Petitioner had such items been tested for DNA. Defense counsel summarized that "because the scene wasn't processed correctly and investigated properly and the investigation report that we have to work with is so limited and

incomplete and has inconsistencies in it, that . . . prejudices [the Petitioner]." Upon questioning, defense counsel acknowledged to the court that he was not asserting that the alibi defense should not have been carried out, but was instead claiming that other evidence could have been recovered if the scene had been processed correctly. The prosecutor responded that "any suggestion that certain evidence would have been found is completely speculative in nature," and Mr. Smith cannot help answer the question of whether the Petitioner was the perpetrator of the arson. After further argument, the post-conviction court concluded, "I don't see where we are going at post[-]conviction with the jury verdict, an expert that agrees it was arson, an expert that cannot tell us who committed the arson. I am going to sustain the objection as to totally irrelevant at post[-]conviction relief." Defense counsel asked Mr. Smith to step down and called his next witness.

Tammy Neller, the Petitioner's sister-in-law, testified that she gave her niece, Whitney Pratt, a ride to school the morning of the incident because the Petitioner was taking her car to be repaired. Ms. Neller left with Ms. Pratt around 7:45 a.m., and she did not see the Petitioner again for the rest of the day.

Ms. Pratt testified that she saw the Petitioner counting approximately $3,400 or $3,500 the Saturday night before the fire. The Petitioner told her that he had enough to pay the bills and get her car fixed. She did not know where the money came from but had overheard him talking to her mother about "going to pick up a copper run and taking it across the state line to Alabama to sell it[,]" which was something he did regularly. She said that she never discussed her seeing the money with counsel because she "was never asked." She elaborated that having never gone "through anything like this before," she was nervous and did not know what she should tell counsel if he did not ask.

Shena Huntley, a friend of the Petitioner, testified that she talked to the Petitioner on the phone while he was in custody prior to trial. However, she did not recall having a conversation with him in which she said that she was having memory problems and that the State would have to tell her what to say at trial. Ms. Huntley said that counsel did not interview or speak with her prior to trial. She acknowledged that counsel had represented her son in a case that "didn't have any evidence at all," and her relationship with counsel deteriorated because of his handling of the case.

Brad Elliott, a retired TBI agent, testified about his role in the investigation of the case. Mr. Elliott recalled that he and the other investigators tried to figure out whether the Petitioner came into a large amount of money from the robbery or if he made it in some other way. Mr. Elliott said that if a witness had told him something about the money, it would have been memorialized in a report. He was never able to find any evidence that the money came from a source other than the victim. On cross-

examination, Mr. Elliott said that there was no DNA or fingerprint evidence found at the crime scene because "[h]eat and water destroys it[.]"

The post-conviction court entered a written order denying relief on February 2, 2017. In making this determination, the post-conviction court noted that "[e]ach and every allegation [by the Petitioner] rests on mere speculation. [The] Petitioner fails to show that any deficiencies in [counsel]'s representation had an adverse effect on his defense." The court also noted that it would "not question the trial strategy of this very good defense lawyer. [The] Petitioner has failed to show that any alleged deficiency was unsound trial strategy." The Petitioner appealed.

## ANALYSIS

The Petitioner argues that he received ineffective assistance of counsel because counsel failed to: conduct a prompt and adequate pretrial investigation; adequately prepare for trial and present a defense; and request that DNA found during the investigation of the case be submitted to CODIS to possibly exculpate him. He also argues that the post-conviction court abused its discretion by not allowing his expert to testify completely at the evidentiary hearing in order to prove prejudice. The Petitioner further argues that the cumulative effect of the errors committed in the case requires reversal. The State asserts that the petition should be dismissed as untimely.

Under the Post-Conviction Procedure Act, a claim for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a).

The post-conviction statute contains a specific anti-tolling provision:

> The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file the action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

Id.

- 10 -

Subsection (b) of the statute sets forth the three narrow exceptions under which an untimely petition may be considered: (1) when the claim is based on a constitutional right not recognized as existing at the time of trial; (2) when the claim is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense; and (3) when the claim seeks relief from a sentence that was enhanced because of a prior conviction that was subsequently held to be invalid. Id. § 40-30-102(b). In addition to the statutory exceptions, our supreme court "has identified three circumstances in which due process requires tolling the post-conviction statute of limitations": (1) when a claim for relief arises after the statute of limitations has expired; (2) when a petitioner is prevented by his or her mental incompetence from complying with the statute's deadline; and (3) when attorney misconduct necessitates the tolling of the statute. Whitehead v. State, 402 S.W.3d 615, 623-24 (Tenn. 2013).

The Tennessee Supreme Court denied the Petitioner's application for permission to appeal on February 12, 2014. The Petitioner filed his pro se petition for post-conviction relief on July 2, 2015, which was more than four months after the statute of limitations had expired. None of the statutory exceptions to the limitations period apply in this case, and there are no general due process concerns that favor equitable tolling. It simply appears as though the Petitioner believed that he had one year from the date that the United States Supreme Court denied his petition for writ of certiorari to file a petition for post-conviction relief. However, the clock starts when "the highest *state* appellate court" has ruled on the appeal. Tenn. Code Ann. § 40-30-102(a) (emphasis added). This court has held that "[t]here is no reason why a defendant cannot seek post-conviction relief pursuant to our Post-Conviction Procedure Act while his or her petition for certiorari to the United States Supreme Court is pending[,]" and "due process does not require tolling the statute of limitations" during the pendency. John Haws Burrell v. State, No. E1999-02762-CCA-R3-PC, 2001 WL 15792, at *2 (Tenn. Crim. App. Jan. 8, 2001), perm. app. denied (Tenn. May 21, 2001); see also Artis Whitehead v. State, No. W2008-00815-CCA-R3-PC, 2009 WL 723849, at *2 (Tenn. Crim. App. Mar. 19, 2009), perm. app. denied (Tenn. Aug. 31, 2009). Accordingly, the Petitioner's petition was filed outside the statute of limitations, and we dismiss the appeal for lack of jurisdiction.

In any event, the Petitioner failed to prove that he received ineffective assistance of counsel. The record shows that trial counsel's preparation for and investigation of the case was within prevailing professional norms. At the hearing, counsel offered an explanation for any of his actions or inactions that the Petitioner claimed as deficient, and counsel's testimony was accredited by the post-conviction court. With regard to each of the Petitioner's allegations, he has failed to prove deficient performance, prejudice, or both. Of mention, counsel's not seeking additional testing of the DNA evidence was a sound strategy as he "couldn't have asked for anything better" than the results not implicating the Petitioner, and there has been no proof as to what additional testing would

- 11 -

have revealed. In addition, given our assessment of the Petitioner's claims of ineffective assistance being unmeritorious, we likewise conclude that the Petitioner is not entitled to relief under the cumulative error doctrine as we have found no individual errors.

The Petitioner's claim that the post-conviction court abused its discretion by not allowing his expert to testify completely at the evidentiary hearing in order to prove prejudice is moot in light of our determination that the post-conviction court did not have jurisdiction to consider the petition as it was filed outside the statute of limitations. Regardless, we discern no abuse of discretion in the post-conviction court's disallowing the testimony. The possibility that a "better" investigation might have uncovered some beneficial evidence is entirely speculative in nature, and the Petitioner's expert's critiques of the TBI's investigation are irrelevant in light of trial counsel's well-reasoned presentation of an alibi defense.

## CONCLUSION

Based on the foregoing authorities and reasoning, we dismiss the appeal for lack of jurisdiction.

_____
ALAN E. GLENN, JUDGE